IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LINCOLN S. MORRIS,

                Plaintiff,              OPINION AND ORDER

   v.

                                           12-cv-319-wmc

MIKE HUEBSCH, DAVID ERWIN,
EDWIN BARDON, TODD THOMAS,
DANIEL ESSINGTON and JEFF CALHOUN,

                Defendants.

---

      Plaintiff Lincoln S. Morris brings this civil action for violation of his First and Fourth Amendment rights by certain Wisconsin State Capitol Police Officers, who allegedly arrested him for playing his spiritual Chippewa drum in the capitol. Previously, the court granted in substantial part defendants' motion for judgment on the pleadings (*see* 2/28/14 Op. & Order (dkt. #17)), leaving as the sole issue whether qualified immunity applies to Morris's remaining First Amendment damages claim. The parties have since conducted targeted discovery on that question, and defendants subsequently filed a motion for summary judgment. (Dkt. #19.) In addition to filing his opposition, Morris cross-moves for grant summary judgment in his favor, arguing that defendants violated his clearly established First Amendment rights. (Dkt. #27.)

      For the reasons explained below, the court finds that defendants are entitled to qualified immunity, and so their motion to dispose of the individual capacity claims will be granted. Moreover, in light of the court's findings, any claims against defendants in their official capacity also appear to be without merit. Nevertheless, the court will

provide plaintiff with an opportunity to explain why this last portion of his lawsuit should not be dismissed as well.

## UNDISPUTED FACTS[1]

### I. The Parties

Plaintiff Lincoln S. Morris is a member of the Red Cliff Band of Lake Superior Chippewa Indians ("Red Cliff Band"). He lives on the Red Cliff Reservation, a beautiful cape extending into the lake near what is now the Apostle Islands National Lakeshore in Northern Wisconsin, where he observes Native American spiritual practices, including drumming and singing.

Defendant Mike Huebsch was the Secretary of the Wisconsin Department of Administration ("DOA") during all times relevant to Morris's complaint.[2] Defendant Charles A. Tubbs, Sr. was the Chief of Police of the State Capitol Police Department, a DOA division, during the relevant time period. Defendants Edwin Bardon and Todd Thomas are a Detective and Sergeant, respectively, with the State Capitol Police. Defendants Daniel Essington and Jeff Calhoun are both State Capitol Police officers.

---

[1] Neither party filed proposed findings of fact in this case as typically required by the court's local procedure on summary judgment, perhaps because this case has followed an odd procedural path. Magistrate Judge Crocker stayed the case at the preliminary pretrial conference pending a decision on defendants' Rule 12(c) motion. After ruling on that motion, the court opened the case for limited discovery on the qualified immunity issue but set no further schedule. It appears, therefore, that the parties did not receive our preliminary pretrial conference order with our procedures for summary judgment until September of 2016. Since there appears no dispute as to the material facts based on the parties' statements of facts in support of their cross-motions for summary judgment, the court synthesizes those undisputed facts above.

[2] The current Secretary of the DOA is Scott A. Neitzel. If this case continues with claims against defendants in their official capacity, Neitzel will be substituted for Huebsch.

## II. Wisconsin State Capitol Rules Regarding Instruments

Since 1991, individuals have not been permitted to play any musical instruments in the Wisconsin State Capitol without a permit. The "no musical instrument rule" encompasses all musical instruments, as well as items that could be used "like instruments to create music." The rule is not based on the type of music being played, nor does it take into account the race, ethnicity or religious beliefs of the musician.

Well before the 2012 incident that is the subject of the current dispute, Officer Calhoun understood that there was this "historical" prohibition on playing musical instruments in the Capitol without a permit. In fact, he had warned many other individuals of the permitting requirement during his time with the Capital Police, and all of those individuals had voluntarily stopped playing after receiving a warning or had had their instruments seized.

During the events involving Morris, however, the court assumes there were no signs posted anywhere in the Capitol stating that musical instruments in general, or drums in particular, were prohibited in the Capitol. Moreover, no other person has ever been issued a citation for violating the rule against unpermitted musical instruments.

## III. Morris' Citation

On January 26, 2012, Morris traveled to the Capitol as one of about fifty members of the Lake Superior Chippewa Indian Tribes, including the Red Cliff Band and the Bad River Band. The Red Cliff Band had become concerned about a proposed open-pit taconite iron mine in the Penokee Hills near Mellen, Wisconsin, which is approximately 40 miles from its reservation. Their purpose in traveling to the Capitol

was to protest the passage of iron mining legislation denominated "AB 426," which they believed would significantly weaken Wisconsin's existing metallic mining laws to allow rapid approval of the proposed mine. Morris and others hoped to convince members of the Wisconsin State Assembly to vote against AB 426 by lobbying, expressing their opposition and engaging in respectful and nonviolent protest within the Capitol.

Morris brought with him a spiritual Chippewa drum, which he made on December 31, 2011. To the Chippewa people, drumming is a sacred form of musical expression that communicates feelings and spiritual energy, which cannot be expressed with the voice alone. Around noon, a five-person, Bad River Band spiritual drum group played a spiritual drum song and Chippewa prayer on the ground floor level of the Capitol rotunda. Even though the song was performed without permission, the Capitol Police advised the group that they could complete their one song without being ticketed and could then move to an Assembly room to perform a ceremony.

At the time the Bad River Band was performing, Morris was on the first floor of the rotunda, preparing to play his own drum. When the Bad River Band finished, Morris began to play his own drum softly. Officer Calhoun saw Morris playing his drum on the first floor area of the rotunda and approached him.

Calhoun and Morris then had a conversation, the substance of which is in dispute. Calhoun avers that he specifically told Morris to stop drumming because individuals need a permit to play a musical instrument in the Capitol. In contrast, Morris not only avers that Calhoun did *not* tell him that, but also failed to explain that: (1) Morris could not drum anywhere in the Capitol; (2) he could not have the drum inside; (3) he needed a

4

permit to drum; or (4) he could drum within the Capitol provided he had a permit. Instead, Morris indicates that Calhoun and he had a very brief conversation, during which Morris agreed to stop drumming on the first floor. Nevertheless, he was led to believe that he could drum on the ground floor, where the Bad River Band had been doing just that, albeit briefly. Morris also indicates that Calhoun was wearing earplugs and did not seem to hear him well.

About fifteen minutes later, Morris went down to the ground floor of the rotunda. As fate would have it, he was welcomed by a group of about fifteen "Noontime Solidarity Singers," who were at the time regularly gathering to sing and chant against the policies of Governor Scott Walker. They invited Morris to drum his prayer in opposition to AB 426, and Morris began playing his drum for a second time, at a volume lower than the Solidarity Singers' vocal performance. Consequently, within a few minutes, Officer Calhoun approached Morris again, this time accompanied by Officer Essington and other armed State Capitol Police Officers. While neither Calhoun nor Essington knew that Morris was Native American, the Capitol police knew generally that Native Americans were present that day. (*See* Glenn M. Stoddard Decl. Ex. E (dkt. #29-5) (incident report regarding Bad River Band drumming).)

At that time, Officer Calhoun told Morris to stop playing his drum, and Morris was asked to leave the Capitol, which he did. As he was leaving, however, Morris tried to speak with defendants, saying that he: (1) had misunderstood Calhoun's earlier instructions; and (2) believed he had a constitutional right to play his drum inside the Rotunda. Officer Calhoun told him that his actions were considered "playing" an

5

instrument, and that he would need to leave the Capitol building with his drum or risk a citation for disorderly conduct. Morris then left the building, agreeing not to take his drum back inside, although he claims to have received permission from Officer Calhoun to go back inside to pick up his things and store his drum.

Despite his compliance, Calhoun thereafter stopped Morris and issued him a citation for disorderly conduct for playing a musical instrument in the Capitol under Wis. Admin. Code § ADM 2.14(2)(k). Morris denies asking to be arrested or to be given a citation for his actions. The Dane County District Attorney later dismissed the citation.

OPINION

The sole question before the court at this point is whether defendants are entitled to qualified immunity -- that is, whether they violated Morris' clearly-established First Amendment rights by arresting and citing him for playing his drum in the Capitol. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012). While qualified immunity is nominally an affirmative defense, once a defendant has raised it, the plaintiff has the burden of defeating it. *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). Specifically, a plaintiff must show that: (1) the facts alleged demonstrate a constitutional

6

violation; and (2) the constitutional right was clearly established. *Estate of Escobedo*, 702 F.3d at 404 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

"A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Estate of Escobedo*, 702 F.3d at 404 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). In contrast, "[i]f officers of reasonable competence could disagree on the issue [of whether or not an action was constitutional], immunity should be recognized." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. A plaintiff may show that a right was clearly established either by "show[ing], on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

Whether a right was "clearly established" at the time of the purported misconduct is a question of law. *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier*, 533 U.S. at 201, but courts resolving the question on summary judgment must exercise care to draw inferences in favor of the nonmovant and to avoid

"defin[ing] a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 134 S. Ct. at 1866.

I.     **Content Neutrality**

With those principles of qualified immunity as backdrop, the court turns to the First Amendment claim itself. There is no real dispute that musical expression is protected by the First Amendment. *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). The Capitol itself "may be thought of as either a traditional or a designated public forum," although even this was the subject of some debate in 2012. *Kissick v. Huebsch*, 956 F. Supp. 2d 981, 999 (W.D. Wis. 2013). As a public forum, content-based discrimination against speech is subject to strict scrutiny. *Id.*; *see also Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) ("Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."). However, content-*neutral* restrictions on time, place or manner of engaging in protected speech are permissible as long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Ward*, 491 U.S. at 791.

Morris argues that the rule prohibiting musical instruments is, in fact, content-based, requiring the court to perform a strict scrutiny analysis, because it is based upon the type of music being played, restricting instrumental music while permitting vocal music. However, this argument misapprehends the meaning of a content-based restriction. As the Supreme Court recognized in *Ward*, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner

8

cases in particular, is whether the government has adopted a regulation of speech *because of disagreement with the message it conveys.*" *Ward*, 491 U.S. at 791 (emphasis added). A facially-neutral law "does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014). "On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* (alteration in original) (quoting *Ward*, 491 U.S. at 791).

Here, the rule against playing musical instruments without a permit may affect speakers using instruments, rather than those using their voices, but that alone does not render it a content-based restriction. Critical to that determination is the purpose behind the rule, which was still unclear at the time the court decided the previous motion for judgment on the pleadings. (*See* 2/28/14 Op. & Order (dkt. #17) 11 ("it is at least possible to infer . . . that the restriction may have been created on the day that plaintiff arrived in the Capitol, as an ad-hoc response to the Native American protests then taking place"). Defendants have since come forward with uncontroverted evidence that the rule has been in place since at least 1991 and that its purpose is to control the level and quality of sound in the Capitol. This purpose has nothing to do with the content of the message being conveyed. *Cf. Ward,* 491 U.S. at 792 (desire to control noise levels at bandshell events and avoid undue intrusion into residential areas had nothing to do with content of the music itself).

The record also indicates that officers, including some of the defendants in this case, had warned multiple other individuals of the requirement that they obtain a permit to play musical instruments in the Capitol.  The rule was not, therefore, created as an *ad hoc* means of stifling Native American drum prayer -- a possibility that might have justified the application of strict scrutiny.  (*See* 2/28/14 Op. & Order (dkt. #17) 10-11.)

Morris's citation to *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), does not support a different result.  In *Discovery Network*, the Supreme Court held that Cincinnati's ban on newsracks distributing commercial publications was not content-neutral because "the very basis for the regulation [was] the difference in content between ordinary newspapers and commercial speech."  *Id.* at 429.  While the city's interest in safety and esthetics might have justified a limit on the overall number of newsracks, there was no neutral justification for the *selective* ban the City enacted, which prohibited only newsracks containing commercial publications.  *See id.* at 429-30.  "[W]hether any particular newsrack [fell] within the ban [was] determined by the content of the publication resting inside that newsrack."  *Id.* at 429.  In contrast, here, the operation of the rule does not depend on the content of the music to be played; it depends on whether the speaker is using an instrument or not.  This restricts the *manner* of expressing ideas, but not the content of the expression; that is, it "control[s] the surrounding circumstances of speech without obstructing discussion of a particular viewpoint or subject matter."  *Schultz v. City of Cumberland*, 228 F.3d 831, 841 (7th Cir. 2000).  Accordingly, the rule is content-neutral on its face.

Morris also briefly argues that even if the rule is facially neutral, defendants *applied* it based on the content of his speech. Specifically, while he does not dispute that Capitol police had warned other individuals of the permitting requirement, he argues that he is the only one ever to receive a *citation*, which he argues permits an inference that he was cited based on the significance of his drumming. However, the court finds such an inference would be unreasonable -- at least on this record. Morris was *not* cited the first time he drummed; rather, according to his own version of the facts, he agreed to stop drumming on the first floor and was left to go about his day. Although he claims Office Calhoun failed to inform that he needed a permit to drum at all, it was only after he began playing his drum *again*, on the ground floor, that he received a citation. In contrast, it is undisputed that in other cases involving the no-instrument rule, the individual voluntarily stopped playing or the instrument was seized. In fact, the other members of the Bad River Band – who, according to the record, performed the same type of drum prayer with essentially the same message -- were *not* cited, because they stopped playing after the first warning. Since plaintiff is unable to offer a single example of someone being let go without citation for a second violation, much less a policy of doing so, he cannot meet his burden in an as-applied challenge based on the assertion that he alone was singled out since he alone appears the only one to violate the rule twice.[3] Since it would be unreasonable to infer a content-based application of the rule to Morris on this record, the court concludes the rule itself is content-neutral and will apply

---

[3] Technically, one might argue that the police treated him differently, by giving him a citation, rather than confiscating his drum, but under the qualified immunity standard, the court is hard pressed to articulate a clearly established constitutional right to confiscation but not citation, at least absent any evidence that the officers here were acting with an ulterior motive.

11

intermediate scrutiny in determining whether the enforcement of the no-instrument rule violated Morris' clearly-established constitutional rights.

## II. Intermediate Scrutiny

As noted above, to survive intermediate scrutiny, a regulation must be "narrowly tailored to serve a significant governmental interest," *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984), and they must "leave open ample alternative channels for communication of the information," *id.* (quoting *Clark*, 468 U.S. at 293). While there is no real dispute that the government has "a substantial interest in protecting its citizens from unwelcome noise," *id.* at 796 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)), Morris argues that the regulation is neither narrowly tailored, nor does it leave open ample alternative channels, making its enforcement a clear violation of his First Amendment rights.

A restriction is considered narrowly tailored so long as it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800. In this regard, the Supreme Court has noted that courts owe a measure of deference to the lawmaker's judgment. *See Hill v. Colorado*, 530 U.S. 703, 727 (2000). Even so, "the government still 'may not regulate expression in

such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *McCullen*, 134 S. Ct. at 2535 (quoting *Ward*, 491 U.S. at 799)).

As for the "ample alternative channels" requirement, "[a]n adequate alternative does not have to be the speaker's first choice." *Weinberg v. City of Chi.*, 310 F.3d 1029, 1041 (7th Cir. 2002). Nor need it be a channel that "provides the same audience or impact for the speech." *Gresham v. Peterson,* 225 F.3d 899, 906 (7th Cir. 2000). Instead, an alternative "must be more than merely theoretically available. It must be realistic as well." *Id.* (citing *Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85 (1977)). "Furthermore, an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Id.* at 907 (citing *Bery v. City of N.Y.*, 97 F.3d 689, 698 (2d Cir. 1996)).

The rule requiring a permit to play an instrument does not clearly violate these principles. As a general matter, musical instruments can reach volumes far exceeding the limits of the human voice; in fact, drumming in the Capital has, in the past, proven to be so loud that officers were concerned they would not be heard if they needed to order an evacuation. (Daniel Blackdeer Decl. (dkt. #22) ¶ 4.) By requiring a permit for instruments, and banning them otherwise, the Capitol police ensure that they are aware of, and can plan for, the use of instruments. *Cf. Kissick*, 956 F. Supp. 2d at 1004 (state has a significant interest in requiring an advance permit for every event reasonably expected to attract large crowds, since they can be disruptive "solely by dint of their size"; permitting scheme "allows police to anticipate a disturbance without waiting for an actual violation of a noise ordinance").

13

Morris argues that the no-instrument rule is not tailored to restricting *excessive* noise, pointing out that it includes all musical instruments "regardless of the volume of sound or noise emitted, and regardless of the time of day at issue." (Pl.'s Br. Opp'n (dkt. #29) 31.) He argues that defendants instead could enforce reasonable noise-level restrictions on the use of instruments, which would permit *some* musical expression while ensuring that they could manage the volume of noise inside the Capitol. But a regulation is not invalid just because some less-restrictive alternative means might also serve to help Capitol police manage the noise in the Capitol. *See Ward*, 491 U.S. at 800.

Furthermore, the rule in this case appears to leave open ample alternative channels for Morris and others to express themselves. Speakers are free to use their voices within the Capitol; to request a permit to play an instrument; or to play an instrument outside the Capitol. Admittedly, none of these alternatives may be perfect, since Morris has credibly averred that the use of the drum is a sacred form of musical prayer to the Chippewa people, permitting the expression of "feelings, emotion, and spiritual energy that cannot be expressed with the human voice alone." (Lincoln Morris Aff. (dkt. #28) ¶ 37.) Requesting a permit does impose something of a burden on the speaker. *Kissick*, 956 F. Supp. 2d at 1005. And playing outdoors could render it more difficult (although not impossible) to reach particular audiences, such as elected public officials who work within the Capitol building.[4] But again, a restriction is not unconstitutional merely

---

[4] This court has previously rejected Morris's argument that it is not feasible to play outdoors due to cold weather. *See Kissick*, 956 F. Supp. 2d at 1006 ("Events smaller than 100 persons need not permit to proceed on the lawn just outside the Capitol, and in that way participants may reach out to all who enter and exit the building. Although winter and other inclement weather makes this a decidedly less attractive option for much of the year, this is not a case in which a speaker's

because it fails to provide a "perfect substitute[] for those channels denied to plaintiff[] by the regulation at hand." *Marcavage v. City of N.Y.*, 689 F.3d 98, 107 (2d Cir. 2012). Morris is free to play outdoors to reach public officials as they enter the building, or to convey his message via his voice (even if it cannot communicate the same level of feeling that the drum can communicate), or to seek a permit. These certainly appear to be "feasible alternatives" to unpermitted drumming within the Capitol; at the very least, the rule does not *clearly* foreclose alternative channels of speech, which again is the standard for qualified immunity.[5]

Morris also cites a number of cases involving noise-related ordinances that he contends support his position. First, he points to *Deegan v. City of Ithaca*, 444 F.3d 135 (2d Cir. 2006). At issue in that case were ordinances that prohibited "unreasonable" noise, which the City interpreted to prohibit any noise that could be heard 25 feet away. *Id.* at 140. The court noted that under this interpretation, "the decibel level of speech that would comply with the 25 foot rule was often lower than the decibel level generated by the foot steps of a person in high heeled boots, conversation among several people, the opening and closing of a door, the sounds of a small child playing on the playground, or the ring of a cell phone." *Id.* at 143. Because the regulation prohibited "most normal

---

'ability to communicate effectively is threatened.'") (internal citation omitted).

[5] Morris argues that the defendants have not produced evidence of the standards they use in granting musical instrument permits. Even assuming this is *defendants'* burden, they have produced a declaration from Susan C. Barcia, the Executive Staff Assistant to the Chief of Police for the Division of Capitol Police of the Wisconsin Department of Administration. (Dkt. #32.) Barcia indicates that the vast majority of permit applications have been approved, including at least 278 permits for musical performances in the Capitol over the last five years. (*Id.* at ¶ 15.)

human activity," the court held it undoubtedly restricted far more speech than was required to eliminate excessive noise, rendering it unconstitutional as applied. *Id.*

Unlike *Deegan*, however, this case does not involve a blanket cap on sound that exceeds a certain volume. It does not even involve a blanket cap on *music.* Rather, the rule at issue imposes a permitting requirement only on musical *instruments*, which defendants report are capable of producing sound at volumes that overwhelm human voices. Regardless, it does not flatly prohibit "most normal human activity," like the regulation in *Deegan,* and so that case is not helpful to Morris -- at least not insofar as establishing a *clear* violation of his constitutional rights.

Morris next cites *United States v. Doe*, 968 F.2d 86 (D.C. Cir. 1992), which involved an ordinance prohibiting the operation of *all* motorized equipment or machinery (including all audio devices) that emitted noise in excess of 60 decibels at 50 feet, as applied to Lafayette Park. The government asserted that it had an interest in maintaining "tranquility," which the court rejected in light of the character of the park at issue:

> Facing Pennsylvania Avenue and located directly across the street from the White House, it is exposed to every form of urban commotion-passing traffic, bustling tourists, blaring radios, performing street musicians, visiting schoolchildren. By no reasonable measure does Lafayette Park display the characteristics of a setting in which the government may lay claim to a legitimate interest in maintaining tranquility.

*Id.* at 89. While the government *did* have an interest in preventing "excessive" noise, the court held that there was no evidence showing that the 60-decibel limit was a reasonable choice "to promote the government's interest in maintaining an appropriate level of

16

sound volume in a traditional public forum park during a permitted demonstration." *Id.* at 91.

Like *Deegan*, *Doe* placed a blanket noise *level* regulation on a public forum, precluding *all* music and speech making use of audio devices above a certain decibel level. Again, the present case is distinguishable. Musical instruments *are* permitted, so long as the speaker receives clearance from the Capitol police ahead of time; and a speaker may still make use of his voice to communicate within the building itself. Furthermore, while the Capitol is certainly either a designated or traditional public forum, there are concerns with sound management inside a government building, where others are attempting to work, that simply do not exist in an outdoor park. Said another way, there is a meaningful difference between flatly banning all forms of sound above an arbitrary decibel limit, and requiring advance permission for musical instruments inside a government building.

Finally, Morris cites *Casey v. City of Newport, R.I.*, 308 F.3d 106 (1st Cir. 2002), which involved a ban on sound amplification in the context of both singing and musical instruments. That case is not particularly helpful, because the court merely concluded that the lower court had not properly applied the narrow tailoring test articulated in *Ward*. Despite the potential problems with the ordinance in that case, however, the First Circuit held that there was "no basis in law for ordering the entry of judgment for appellants." *Id.* at 120. The court, therefore, remanded for the proper narrow-tailoring analysis, instructing the court below to consider whether merely enforcing the already-existing noise ordinance would adequately further the government's interest in noise

17

reduction, given that there was nothing in the record addressing that question. *See id.* at 116, 120.[6]

Thus, none of the cases Morris points to make clear that the rule in this case violates his First Amendment rights. Furthermore, the court's own application of the requirements of intermediate scrutiny demonstrates that the permitting requirement for musical instruments is a constitutional restriction on time, place and manner of speech. Regardless, on the record before this court, the officers did not violate Morris's clearly-established First Amendment rights by prohibiting him from playing his drum without a permit inside the Capitol building, and so they are entitled to summary judgment on the claims against them in their individual capacities.

The court's finding that the permitting requirement for musical instruments is a constitutional restriction on time, place and manner of speech would also appear to foreclose any claims for declaratory or injunctive relief against defendants in their official capacity. Defendants, however, did not seek judgment on that basis with respect to those claims. As such, pursuant to Federal Rule of Civil Procedure 56(e), the court will

---

[6] In addition to the cases cited in plaintiff's briefs, plaintiff filed a motion to supplement (dkt. #35) and a notice of supplemental authority (dkt. #37), while the motion for qualified immunity was pending. The court has reviewed these cases, but none apply to the permitting requirement for musical instruments at issue in this case. In *Crute*, the Court of Appeals considered administrative regulations imposing a civil forfeiture on individuals who participate in an unpermitted "event" -- the same regulation this court considered in *Kissick*. (Pl.'s Mot., Ex. 1 (dkt. #35-1).) The court also reviewed the United States Supreme Court's decision in *Reed v. Town of Gilbert*, but found that the challenged signage regulation at issue in that case was distinguishable from the musical instrument permitting requirement here. (Pl.'s Not. of Suppl. Authority (dkt. #37-1). Both sides also provided supplemental authority on qualified immunity, but neither case alters the well-established legal standards or the court's analysis. (Defs.' Not. of Suppl. Authority (dkt. #36-1); Pl.'s Not. of Suppl. Authority (dkt. #37-2).)

provide plaintiff with the opportunity to explain why judgment should not entered in defendants' favor on all official capacity claims.

ORDER

IT IS ORDERED that:

1) Defendants' motion for partial summary judgment on qualified immunity (dkt. #19) is GRANTED.

2) Plaintiff's motion to supplement (dkt. #35) is GRANTED.

3) On or before March 17, 2017, plaintiff should file a brief explaining why, in light of the court's finding that the permitting requirement for musical instruments is a constitutional restriction on time, place and manner of speech, the court should not enter judgment in defendants' favor on plaintiff's official capacity claims.

Entered this 3rd day of March, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge